WMN:SLT
F.#2010R01428

# M-10-858

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

JASON FRIEDMAN,
    also known as "Noc,"
MATE PEROS,
    also known as "Tiny," and
MARCEL PUISSANT,
    also known as "the Model,"

        Defendants.

- - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

THE PREMISES KNOWN AND
DESCRIBED AS 162-28 12TH AVENUE,
QUEENS, NEW YORK

- - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

THE PREMISES KNOWN AND
DESCRIBED AS 215-01 PECK AVENUE,
QUEENS, NEW YORK

- - - - - - - - - - - - - - - X

**FILED UNDER SEAL**


AFFIDAVIT AND COMPLAINT
IN SUPPORT OF APPLICATION
FOR ARREST WARRANTS

(T. 21, U.S.C., § 846)


AFFIDAVIT IN SUPPORT
OF SEARCH WARRANT

(T. 21, U.S.C., § 846)


AFFIDAVIT IN SUPPORT
OF SEARCH WARRANT

(T. 21 U.S.C., § 846)


EASTERN DISTRICT OF NEW YORK, SS:

        DIETTE RIDGEWAY, being duly sworn, deposes and states

that she is a Special Agent of the Drug Enforcement

1

Administration ("DEA"), duly appointed according to law and acting as such.

Upon information and belief, there is probable cause to believe that in or about and between January 2000 and July 2010, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants JASON FRIEDMAN, also known as "Noc," MATE PEROS, also known as "Tiny," and MARCEL PUISSANT, also known as "the Model," together with others, did knowingly and intentionally manufacture, distribute and possess with intent to manufacture and distribute a controlled substance, which offense involved 1,000 or more marijuana plants, in violation of Title 21, United States Code, Section 841(a).

(Title 21, United States Code, Sections 846 and 841(b)(1)(A)(vii))

The source of your deponent's information and the grounds for her belief are as follows:[1]

### Qualifications and Sources of Information

1.    I have been a Special Agent with the DEA for approximately ten years.  During that time, I have investigated numerous cases involving the importation and distribution of

---

[1]    Because the purpose of this Complaint is to state only probable cause to search and arrest, I have not described all the relevant facts and circumstances of which I am aware.

illegal drugs.   My training, education and experience includes debriefing numerous cooperating witnesses; monitoring wiretapped conversations of individuals involved in narcotics trafficking and money laundering; reviewing taped conversations and narcotics and money laundering records; conducting numerous searches of locations where narcotics and money laundering records, evidence and proceeds have been found; and conducting surveillance of individuals engaged in such offenses.   Through this training and experience, I have become familiar with the manner in which narcotics trafficking and money laundering are committed, the method of payment and collection of payment in such schemes, and the efforts of persons involved in such activity to avoid detection by law enforcement.

      2.   The facts set forth in this affidavit are based in part on information that I have learned from review of written documents prepared by, and conversations with, other law enforcement officers associated with the DEA, as well as other state and federal law enforcement agencies, including the debriefing of cooperating witnesses by myself and/or other law enforcement agents.   All conversations with confidential informants and cooperating witnesses are set forth in substance and in part only.

3

## Background of the Investigation and the Defendants

3.   For approximately the past four years, the DEA and
several local law enforcement agencies have been investigating a
Queens-based narcotics trafficking organization that calls itself
"The Master Race" or "TMR."   The four-year investigation, which
has included the use of physical and electronic surveillance,
information obtained from numerous confidential sources who have
proven to be reliable, and multiple seizures of narcotics and
narcotics proceeds, revealed that "The Master Race" organization
maintains marijuana grow-houses in Queens, New York, in which
thousands of pounds of marijuana is grown hydroponically for
distribution in the Eastern District of New York and elsewhere.
The investigation has further revealed that defendants JASON
FRIEDMAN, also known as "Noc," MATE PEROS, also known as "Tiny,"
and MARCEL PUISSANT, also known as "the Model," have all been
members of TMR for more than ten years, and are responsible for
growing thousands of marijuana plants at various locations in
Queens, New York.

4.   During the course of the investigation, law
enforcement officers executed search warrants on multiple grow
houses and stash locations used by members of TMR, resulting in
the seizure of more than one thousand marijuana plants, extensive
marijuana growing equipment, narcotics packaging materials and

4

other paraphernalia associated with the manufacture, processing and distribution of hydroponic marijuana.

5. During the course of the investigation, DEA agents. received considerable information about the drug trafficking activities of JASON FRIEDMAN, MATE PEROS, MARCEL PUISSANT and the entire TMR organization from a former TMR associate who agreed to cooperate with the government ("CW1"). In sum and substance, CW1 stated that he/she was an associate of the drug trafficking organization called "The Master Race" or "TMR" since it was founded in the mid 1980s. CW1 further stated that TMR began as a graffiti and street gang, but became involved in the large scale growing of hydroponic marijuana in Queens, New York more than fifteen years ago. TMR and its members grow hydroponic marijuana in various "grow houses" throughout Queens; harvest, process and package the marijuana; and then distribute the marijuana throughout the New York area, generating enormous profits. While an associate of TMR, CW1 grew hydroponic marijuana supplied by TMR and also distributed processed marijuana grown by other members of TMR.

6. According to CW1, the TMR organization is structured into several "crews," each led by a "captain," who will nominate trusted associates for membership in the organization. In addition to its actual "members," TMR also

employed a myriad of "associates" to act as grow house workers,

transporters and retail distributors. Once becoming a full-

fledged member of TMR, a member was responsible for finding

locations suitable for use as hydroponic grow houses and

purchasing the necessary grow equipment. CW1 further stated that

TMR members would typically rent the houses and preferred to use

ranch style houses with large basements and electric meters that

were located inside the house. Once a grow house was set up, a

TMR captain would provide the crew member with clones cut from

mother plants controlled by TMR, which would be used to start the

new grow operation. The crew member would then be responsible

for securing, cultivating and caring for the crop until it was

ready to be harvested. When harvest time arrived (usually after

about two months), TMR members would clip, dry and package the

marijuana, which was then distributed by members and associates

of TMR. CW1 further stated that TMR captains and crew members

all shared in the profits from TMR grow houses. CW1 stated that

TMR captains were responsible for overseeing up to 20 grow houses

at a time and all made several million dollars from their

positions in TMR.

7.    CW1 identified more than forty members of TMR,

including seven TMR members that were subsequently convicted for

their marijuana trafficking activities in federal and/or state

6

court.   CW1 specifically identified JASON FRIEDMAN, MATE PEROS, MARCEL PUISSANT, William Athens, Gregory Kussoff and Patrick Murray as full-fledged members of TMR.   In particular, CW1 stated that FRIEDMAN, PEROS and PUISSANT were each responsible for establishing and maintaining multiple hydroponic grow houses on behalf of TMR and collectively generated millions of dollars in profits for TMR.   CW1 worked directly with FRIEDMAN and PUISSANT for several years.   CW1 was also familiar with MATE PEROS's role in the organization and stated that his brother, Renato Peros, was a high-level leader in TMR for many years.[2]   The information provided by CW1 has proven to be reliable and has led to multiple narcotics seizures and the successful prosecution of several TMR members and associates.

        8.    During the course of the investigation, DEA agents also received considerable information about the drug trafficking activities of JASON FRIEDMAN, MATE PEROS, MARCEL PUISSANT and the entire TMR organization from a former TMR associate who agreed to cooperate with the government ("CW2").   In sum and substance, CW2 stated that he/she was an associate of the drug trafficking organization called "The Master Race" or "TMR" for more than ten years.   CW2 acted as a retail marijuana distributor and sold

---

[2] Renato Peros pled guilty in the Eastern District of New York to a conspiracy to distribute marijuana and is currently awaiting sentencing.

hundreds of pounds of hydroponic marijuana grown by members of TMR.

9.   Due to his/her close association with TMR for over a decade, CW2 became familiar with the organization's structure, operation and membership. In sum and substance, CW2 stated that TMR was divided into numerous crews, which maintained hydroponic marijuana grow houses throughout Queens, New York.   CW2 identified dozens of TMR members, including several captains/leaders that were subsequently convicted for their role in the organization. According to CW2, TMR captains received a cut of the profits from each grow house run by TMR members.   In particular, CW2 identified JASON FRIEDMAN, MATE PEROS and MARCEL PUISSANT as TMR members responsible for maintaining hydroponic grow houses throughout Queens, New York. CW2 further stated that FRIEDMAN, PEROS and PUISSANT ran multiple grow houses but each paid a "cut" of their profits to higher-ranking members of TMR. The information provided by CW2 has proven to be reliable and has led to multiple narcotics seizures and the successful prosecution of several TMR members and associates.

10.   During the course of the investigation, DEA agents also received considerable information about the drug trafficking activities of JASON FRIEDMAN, MATE PEROS, MARCEL PUISSANT and the entire TMR organization from another former TMR associate who

agreed to cooperate with the government ("CW3").  In sum and substance, CW3 stated that he/she was an associate of the drug trafficking organization called "The Master Race" or "TMR" for more than seven years.  CW3 acted as a retail marijuana distributor and sold hydroponic marijuana grown by members of TMR.  CW3 also assisted TMR members in establishing and maintaining hydroponic grow houses in Queens.

      11.  Due to his/her close association with TMR for over seven years, CW3 became familiar with the organization's structure, operation and membership.  According to CW3, the TMR organization has been growing hydroponic marijuana since the mid 1990s and is responsible for producing thousands of marijuana plants, which TMR and its associates distribute throughout the Eastern District of New York.  CW3 identified dozens of TMR members including, among others, JASON FRIEDMAN, MATE PEROS, MARCEL PUISSANT, William Athens and Patrick Murray.  According to CW3, these individuals were collectively responsible for establishing and maintaining dozens of hydroponic marijuana grow houses in Queen, New York.  CW3 further stated that FRIEDMAN, PEROS, PUISSANT and Murray were all members of TMR since the beginning of the organization.   The information provided by CW3 has proven to be reliable and has led to multiple narcotics

seizures and the successful prosecution of several TMR members and associates.

12.   During the course of the investigation, DEA agents also received considerable information about the drug trafficking activities of JASON FRIEDMAN, MATE PEROS, MARCEL PUISSANT and the entire TMR organization from another former TMR associate who agreed to cooperate with the government ("CW4").   In sum and substance, CW4 stated that he/she was a customer and associate of the drug trafficking organization called "The Master Race" or "TMR" for more than ten years.   CW4 acted as a retail marijuana distributor and sold hydroponic marijuana grown by members of TMR.

13.   Due to his/her close association with TMR for over a decade, CW4 became familiar with the organization's structure, operation and membership.   According to CW4, the TMR organization has been growing hydroponic marijuana since the mid 1990s and is responsible for producing thousands of marijuana plants, which TMR and its associates distribute throughout the Eastern District of New York.   CW4 stated that TMR had between 80 and 100 full-fledged members throughout its existence, and an even greater number of associates.   CW4 identified dozens of TMR members including, among others, JASON FRIEDMAN, MATE PEROS, MARCEL PUISSANT, William Athens, Gregory Kussof, Renato Peros and

10

Patrick Murray.  According to CW4, these individuals were collectively responsible for establishing and maintaining dozens of hydroponic marijuana grow houses in Queen, New York.  CW4 further stated that FRIEDMAN, PEROS, PUISSANT and Murray were all members of TMR since the beginning of the organization. According to CW4, JASON FRIEDMAN and MATE PEROS each controlled at least five separate marijuana grow houses at a time, and MARCEL PUISSANT controlled at least three separate marijuana grow houses at a time.  The information provided by CW4 has proven to be reliable and has led to multiple narcotics seizures and the successful prosecution of several TMR members and associates.

14.  CW4 further stated that the TMR organization employs violence in furtherance of its drug trafficking activities.  For example, while associated with TMR, CW4 was present during a violent kidnaping in the late summer/early fall of 2001.  According to CW4, TMR leader Renato Peros believed that two individuals were responsible for stealing approximately 17 pounds of marijuana belonging to TMR.  Peros had the two individuals forcibly brought to his house by members of TMR in order to "discuss" the theft.  CW4 stated that approximately 25 members of TMR were present in Peros's house and took part in the kidnaping.  In particular, CW4 identified JASON FRIEDMAN and MATE PEROS as being present during the kidnaping.  All 25 of the TMR

11

members were armed with guns, knives or other deadly weapons. According to CW4, the TMR members kept the two suspected thieves prisoner for more than seven hours, threatened them with violence, viciously pistol-whipped and assaulted them and refused to allow them to leave unless they admitted to the theft. CW4 further stated that the two suspected thieves were not permitted to leave until one of them agreed to pay TMR $84,000 to cover the cost of the lost marijuana.

15. During the course of the investigation, DEA agents also received considerable information about the drug trafficking activities of JASON FRIEDMAN, MATE PEROS, MARCEL PUISSANT and the entire TMR organization from another former TMR associate who agreed to cooperate with the government ("CW5"). In sum and substance, CW5 stated that he/she was a customer and associate of the drug trafficking organization called "The Master Race" or "TMR" for more than ten years. CW5 acted as a retail marijuana distributor and sold hydroponic marijuana grown by members of TMR.

16. Due to his/her close association with TMR for over a decade, CW5 became familiar with the organization's structure, operation and membership. According to CW5, the TMR organization has been growing hydroponic marijuana since the mid 1990s and is responsible for producing thousands of marijuana plants, which

12

TMR and its associates distribute throughout the Eastern District
of New York. CW5 identified dozens of TMR members including,
among others, JASON FRIEDMAN, MATE PEROS, MARCEL PUISSANT,
William Athens, Gregory Kussof and Renato Peros.  According to
CW5, these individuals were collectively responsible for
establishing and maintaining dozens of hydroponic marijuana grow
houses in Queen, New York.

        17.  CW5 further stated that the TMR organization
employs violence in furtherance of its drug trafficking
activities.  In particular, CW5 provided information regarding
the above-described kidnaping of two TMR customers who were
suspected of stealing marijuana from TMR.  CW5 stated, in sum and
substance, that numerous TMR members kidnaped the two suspected
thieves, threatened and assaulted them and forced them to pay for
the lost marijuana before letting them go.  The information
provided by CW5 has proven to be reliable and has led to multiple
narcotics seizures and the successful prosecution of several TMR
members and associates.

        18.  During the course of the investigation, DEA agents
also received considerable information about the drug trafficking
activities of JASON FRIEDMAN, MATE PEROS, MARCEL PUISSANT and the
entire TMR organization from another former TMR associate who
agreed to cooperate with the government ("CW6").  In sum and

                           13

substance, CW6 stated that he/she was a customer and associate of the drug trafficking organization called "The Master Race" or "TMR" for several years. CW6 acted as a retail marijuana distributor and sold hydroponic marijuana grown by members of TMR. CW6 also sold marijuana to members of TMR on several occasions.

19. According to CW6, the TMR organization has been growing hydroponic marijuana for years and is responsible for producing thousands of marijuana plants, which TMR and its associates distribute throughout the Eastern District of New York. CW6 further stated that the organization originated in 1987 and started out as a graffiti gang before graduating to more violent crimes such as auto theft, robberies and, primarily, the manufacture and distribution of hydroponic marijuana. CW6 identified dozens of TMR members including, among others, MATE PEROS, Gregory Kussof and Renato Peros. The information provided by CW6 has proven to be reliable and has been corroborated by independent evidence.

20. During the course of the investigation, DEA agents also received information about the drug trafficking activities of MARCEL PUISSANT and other members of the TMR organization from another cooperating witness whose information has proven to be reliable and has been corroborated by independent evidence

14

("CW7"). In sum and substance, CW7 stated that the TMR organization has maintained marijuana grow houses throughout Queens for more than a decade. CW7 identified MARCEL PUISSANT as a long-standing member of TMR who is responsible for establishing and operating hydroponic marijuana grow houses. According to CW7, PUISSANT has been growing marijuana for TMR at least ten years.

### Law Enforcement Raids on TMR Grow Houses

21. During the course of the investigation, law enforcement agents identified multiple locations in Queens that were being utilized by TMR members to grow hydroponic marijuana for distribution by the organization. Searches executed on these locations resulted in the seizure of in excess of 1,000 marijuana plants.

22. For example, in July 2006, DEA agents and officers from the New York City Police Department ("NYPD") received information from CW2 identifying a marijuana grow house on 148th Street in Queens, New York ("TMR Grow House 1") that was being operated by TMR member William Athens, also known as "Bone." At the direction of law enforcement officers, CW2 met with Athens and another TMR associate at TMR Grow House 1 to discuss purchasing some of the marijuana TMR was growing at that location. During this meeting, which was surreptitiously

15

recorded by CW2, Athens and CW2 discussed when the marijuana would be ready for distribution and negotiated other aspects of the pending transaction. While in TMR Grow House 1, CW2 observed numerous marijuana plants being grown inside the house.

23. On July 28, 2006, workers from Con Edison went into TMR Grow House 1 in order to turn off the electricity due to non-payment. While inside TMR Grow House 1, the Con Edison workers detected a strong odor of marijuana and observed what they believed to be marijuana leaves. Later the same day, NYPD officers executed a search warrant on TMR Grow House 1 and discovered a hydroponic grow operation. Officers recovered 90 marijuana plants, high-intensity discharge lights and various other materials used in the indoor growing of marijuana and packaging materials consistent with the processing and packaging of marijuana for retail distribution. William Athens, who was present in the house at the time of the search, was arrested by the NYPD and subsequently pled guilty in New York State court.

24. CW3, who was closely associated with Athens and other members of TMR at this time, subsequently confirmed to DEA agents that Athens was operating TMR Grow House 1 on behalf of the TMR organization.

25. In February 2007, DEA agents and officers from the NYPD identified a house on 18th Avenue in Queens, New York as a

16

grow house being operated by TMR captain Gregory Kussoff, also known as "Bucky" ("TMR Grow House 2"). DEA Agents received information from CW2 that Kussoff and his crew were operating five separate hydroponic grow houses in Queens. DEA agents conducted surveillance on Kussoff and observed him purchase hundreds of pieces of plumbing equipment from a hydroponic store that was consistent with the type of equipment used to operate a hydroponic marijuana grow operation. DEA agents continued to follow Kussoff and observed him unload all of the hydroponic plumbing equipment into TMR Grow House 2. DEA agents contacted Con Edison, which sent workers to TMR Grow House 2 to conduct a meter reading. Con Edison discovered that the house was using more than ten times the amount of energy it should have been based on the size of the house and typical energy usage rates.

26. On February 22, 2007, DEA agents executed a search warrant on TMR Grow House 2, which revealed an elaborate hydroponic marijuana grow operation. DEA agents seized more than 250 marijuana plants as well as packaging materials, growing equipment and other narcotics paraphernalia. Kussoff and one of his workers responsible for taking care of TMR Grow House 2 were arrested and subsequently pled guilty for their involvement in growing marijuana for TMR.

17

27.   In January 2008, NYPD officers received a 911 call
from an anonymous caller who reported a marijuana grow house
located on 72nd Drive in Queens, New York ("TMR Grow House 3").
NYPD officers conducted surveillance on the location and observed
JASON FRIEDMAN entering and exiting TMR Grow House 3 on numerous
occasions in January 2008.   A meter reading by Con Edison
revealed that TMR Grow House 3 was using five to ten times the
amount of electricity it should have been based on the size of
the house and typical energy usage rates.

28.   On the evening of January 10, 2008, NYPD officers
and DEA agents executed a search warrant on TMR Grow House 3.
The search revealed an elaborate hydroponic grow operation which
spanned multiple rooms of the house and totaled more than 500
mature marijuana plants.   In addition to the plants, agents also
found high-intensity discharge lights, packaging materials and
other equipment typically used in the manufacture, processing and
distribution of hydroponic marijuana.   At the time of the search,
Marijuana Grow House 3 was unoccupied.   Law enforcement officers
continued to observe TMR Grow House 3 overnight.   The following
morning, JASON FRIEDMAN arrived at the location and officers
observed him unlock the door to TMR Grow House 3 using keys in
his possession.   FRIEDMAN was subsequently arrested.

29.    In August 2008, NYPD officers received a 911 call from an anonymous caller who reported a marijuana grow house located on 184th Street in Queens, New York ("TMR Grow House 4"). NYPD officers conducted surveillance on the location and observed MATE PEROS entering and exiting TMR Grow House 4 on numerous occasions in August 2008.  A meter reading by Con Edison revealed that TMR Grow House 4 was using five times the amount of electricity it should have been based on the size of the house and typical energy usage rates.

30.    On August 14, 2008, NYPD officers and DEA agents executed a search warrant on TMR Grow House 4.  The search revealed a hydroponic grow operation containing 79 marijuana plants.  In addition to the plants, agents also found high-intensity discharge lights, packaging materials and other equipment typically used in the manufacture, processing and distribution of hydroponic marijuana.

31.    On February 24, 2009, NYPD officers received a 911 call from an anonymous caller who reported that a male individual was loading marijuana grow lights into a white rental van in the driveway of 237th Street in Queens, New York ("TMR Grow House 5").  When NYPD officers arrived at that address, the officers observed TMR member Patrick Murray sitting in the driver's seat of a white rental van parked in the driveway of TMR Grow House 5.

19

When questioned about why he was in the area, Murray responded that he was just making a u-turn in the driveway and had no connection to TMR Grow House 5.  Officers then interviewed a tenant who resided in TMR Grow House 5, who stated that he/she had observed Patrick Murray in the basement of TMR Grow House 5 on numerous occasions, most recently that very morning.  The tenant gave consent for the officers to search the basement of the home, which revealed a hydroponic marijuana grow operation containing 100 marijuana plants and an assortment of equipment associated with the manufacture and distribution of marijuana.  A set of keys recovered from Patrick Murray were found to open a locked door leading to the room in the basement used as a grow house.

32.  In April 2010, DEA agents received information from CW7 identifying the location of two marijuana grow houses being run by MARCEL PUISSANT on behalf of TMR.  One of the locations identified by CW7 was an address on 22nd Avenue in Queens, New York ("TMR Grow House 6").  NYPD officers also received a 911 call identifying the same address as a marijuana grow house.  A meter reading by Con Edison revealed that TMR Grow House 6 was using five times the amount of electricity it should have been based on the size of the house and typical energy usage rates.

33.   On April 23, 2010, NYPD officers and DEA agents executed a search warrant on TMR Grow House 6.   The search revealed an elaborate hydroponic grow operation containing more than 140 marijuana plants.   The search further revealed a shotgun and ammunition, marijuana packaging materials, high intensity discharge lights and various equipment used in growing hydroponic marijuana.   While agents were executing the search, MARCEL PUISSANT arrived at Marijuana Grow House 6 in a taxi cab.   The taxi cab pulled up to the front of Marijuana Grow House 6 and PUISSANT got out of the cab and walked towards the house.   When questioned about his connection to TMR Grow House 6, PUISSANT admitted that his dog was inside the house and keys in his possession were found to open the front door of the house.   The landlord who owned TMR Grow House 6 also identified MARCEL PUISSANT as the tenant to which he/she was renting the house. Finally, DEA agents found numerous personal items belonging to PUISSANT inside TMR Grow House 6, including, but not limited to, mail addressed to PUISSANT at the address of TMR Grow House 6 and a bank book belonging to PUISSANT.

34.   Based on my training and experience, I know that the hydroponic marijuana grown by FRIEDMAN, PEROS, PUISSANT and the other members of TMR can sell for up to $7,000 to $8,000 per pound when distributed at the street level.   I also know, based

21

on my training and experience that each marijuana plant grown
hydroponically would produce at least one pound of sellable
marijuana.[2] Accordingly, just the marijuana seized from the six
TMR grow houses discussed above would have resulted in gross
proceeds of more than $8,000,000.00 for the defendants and their
co-conspirators in TMR.

### REQUESTS FOR SEARCH WARRANTS

### Marijuana Grow House Operated by MARCEL PUISSANT

35.   Upon information and belief, there is probable
cause to believe that there is currently concealed in THE
PREMISES KNOWN AND DESCRIBED AS 162-28 12TH AVENUE, QUEENS, NEW
YORK ("SUBJECT PREMISES 1"): narcotics, firearms, scales, cutting
agents, other drug paraphernalia, wrapping materials, including
plastic bags and rubber bands, discarded wrappers and other
materials used to conceal and transport narcotics, high intensity
discharge lights and other equipment used in the manufacture of
hydroponic marijuana, money counters, machines used to package
narcotics, surveillance equipment, telephones, SIM cards,
currency, financial records, including rental agreements, utility
bills, telephone bills and gas bills, car ownership records,

---

[2]    These numbers reflect conservative estimates based on my
previous experience.  The actual value and weight of sellable
marijuana produced by the marijuana plants seized in this case
will depend on the potency level of tetrahydrocannabinol ("THC").

safes, drug records and money laundering records, including ledgers, papers, computer records and other documents reflecting information such as names, telephone numbers, addresses and financial records of individuals involved in trafficking in narcotics, books and records showing cash transactions and prices and/or quantities of narcotics purchased and payments received, correspondence, facsimiles, memoranda, canceled checks, drafts, wire transfer receipts, money orders, notes and notebooks, all of which constitutes evidence, fruits and instrumentalities of violations of Title 21, United States Code, Section 846, conspiracy to manufacture, distribute and possess with intent to distribute narcotics.

## DESCRIPTION OF SUBJECT PREMISES 1

36.   SUBJECT PREMISES 1 is described as a single-story detached single-family ranch style home.   The house is red and white with a driveway on the left, a detached garage and 2 attic vents on the roof.   The house is located at 162-28 12th Avenue, Queens, New York and the number 162-28 is affixed to the front of the house.

## PROBABLE CAUSE TO SEARCH SUBJECT PREMISES 1

37.   As discussed in detail above, MARCEL PUISSANT has been a member of the TMR organization for more than ten years and is responsible for identifying locations that can be used to grow

hydroponic marijuana for TMR, establishing and operating these
hydroponic grow houses for TMR and distributing the marijuana
generated by the grow houses under his control.

38.   As discussed in paragraphs 32-33 above, CW7
informed DEA agents that MARCEL PUISSANT was operating two
hydroponic grow houses in Queens, New York.   The first grow house
identified by CW7 was TMR Grow House 6.   Agents corroborated
CW7's information and executed a search warrant on TMR Grow House
6 on April 23, 2010.   The search revealed that PUISSANT was
operating a marijuana grow house at the location identified by
CW7, which contained more than 140 plants.

39.   In addition to TMR Grow House 6, CW7 also
identified a second grow house being operated by PUISSANT.
Specifically, CW7 identified a residential house on 12th Avenue
in Queens, New York, which agents subsequently confirmed to be
SUBJECT PREMISES 1.   CW7 stated, in sum and substance, that
PUISSANT had set up a marijuana grow operation in SUBJECT
PREMISES 1 on behalf of TMR.   CW7 further stated that PUISSANT
employed another individual to watch the grow house and maintain
the marijuana plants.   NYPD officers conducting surveillance on
SUBJECT PREMISES 1 observed a van parked in the driveway that was
registered to a family member of the worker identified by CW7. In addition,
CW7 provided the name of the worker's girlfriend. Con Edison
records revealed that the utilities for SUBJECT PREMISES 1
~~that is~~ are registered to the worker's girlfriend. The utilities
were transferred to her name only a few days after
law enforcement agents raided Puissant's other grow
house in April 2010

40.  On July 21, 2010, workers from Con Edison

conducted a meter reading of SUBJECT PREMISES 1.  The meter

reading revealed that SUBJECT PREMISES 1 is currently using more

than five times the amount of electricity that it should be based

on the size of the house and typical energy usage rates.  Based

on my training and experience, I know that hydroponic marijuana

grow houses will have meter readings that are excessively high

because the high intensity discharge lights needed to grow

marijuana indoors use an enormous amount of electricity.  In a

substantial number of residential marijuana grow houses that I

have investigated during my tenure with the DEA I have observed

excessive energy use similar to that exhibited by SUBJECT

PREMISES 1.

41.  Based on my training and experience, including the

instant investigation, because the typical growing cycle for

hydroponic marijuana is several months and the fact that an

extensive amount of work is necessary to convert a residential

house into a suitable site for growing hydroponic marijuana,

marijuana growers typically use grow houses for many months or

even years without moving their operation to a different

location. *

* There is also probable cause to believe that firearms may be concealed
in SUBJECT PREMISES 2.  First, as described above, Phissant kept a
firearm and ammunition in his other growhouse. Second, the narcotics
present in TMR growhouses raided by the DEA have been worth
hundreds of thousands if not millions of dollars. Based on my training and
experience, drug dealers will often use firearms to protect large drug
stashes from rival drug dealers or potential robbery. Finally, as described
above, TMR members have used firearms and other weapons in
furtherance of their illegal activities.

## DESCRIPTION OF SUBJECT PREMISES 2

43.   SUBJECT PREMISES 2 is described as a detached two-story brick single-family home.  The house has a double-size red front door, an attached garage and a driveway to the right side of the house.  The house is located at 215-01 Peck Avenue, Queens, New York and the number 215-01 is affixed to the front of the house.  Database searches and property records list SUBJECT PREMISES 2 as the home residence of JASON FRIEDMAN and the property is jointly owned by FRIEDMAN and his wife.

### PROBABLE CAUSE TO SEARCH SUBJECT PREMISES 2

44.   As discussed in detail above, JASON FRIEDMAN has been a member of the TMR organization for more than ten years and is responsible for establishing and controlling up to five hydroponic grow houses at a time for TMR and distributing the marijuana generated by the grow houses under his control.

45.   According to CW4, FRIEDMAN has used his home residence to store narcotics and narcotics proceeds in the past. CW4 has been to FRIEDMAN's home residence on numerous occasions and observed several pounds of marijuana in FRIEDMAN's house more than once.[4]

---

[4] While CW4 has not been to FRIEDMAN's current home residence, SUBJECT PREMISES 2, the fact that FRIEDMAN has previously stored narcotics in his home residence supports the inference that he is currently using SUBJECT PREMISES 2 for the same purpose.

46.   On July 21, 2010, DEA agents conducted
surveillance of SUBJECT PREMISES 2.   Agents observed an
unidentified male ("UM1") drive up to SUBJECT PREMISES 2 in a red
pickup truck.   UM1 made a call on his cellular telephone and then
sat in the back of the truck for about fifteen minutes, at which
time JASON FRIEDMAN arrived at SUBJECT PREMISES 2.   FRIEDMAN was
seated on the passenger side of a U-haul rental truck driven by
an unidentified male ("UM2").   A Black Yukon SUV driven by a
third unidentified male ("UM3") followed closely behind the U-
haul and parked in front of SUBJECT PREMISES 2.

47.   After parking the vehicles, FRIEDMAN, UM1 and UM3
took a brown cardboard box out of the back of the red pickup
truck and carried the box into SUBJECT PREMISES 2.   The cardboard
box was approximately 40" by 20" by 18".   While FRIEDMAN and the
other two men were bringing the cardboard box into SUBJECT
PREMISES 2, the driver of the U-haul truck (UM2) surveyed the
area in front of SUBJECT PREMISES 2, constantly looking around to
see if anyone was watching.   Based on their training and
experience, the DEA agents conducting this surveillance believe
that UM2 was acting as a lookout to make sure there were no
witnesses to FRIEDMAN and his associates' activities.

48.   A short time later, FRIEDMAN and the other two men
exited SUBJECT PREMISES 2 and entered their respective vehicles.

28

The red pickup truck departed the area in one direction, and the U-haul departed in a different direction.   UM3 started the black Yukon but waited several moments before driving away.   UM3 appeared to be watching the departure of FRIEDMAN's U-haul and waiting to make sure the truck was not being followed before departing the area.

49.   After the Yukon eventually left the area, the DEA agents attempted to follow FRIEDMAN in the U-haul truck. However, the U-haul executed several counter-surveillance techniques that made surveillance difficult.   Specifically, the U-haul truck made an excessive number of left and right turns in a zig-zag pattern that bore no relation to the actual direction it was traveling.   The U-haul then sped through a red traffic light and was able to break surveillance.   Based on my training and experience, drug traffickers are often extremely conscious of law enforcement surveillance and utilize such counter-surveillance techniques in order to identify law enforcement surveillance and conceal their illegal activities.

50.   Based on the suspicious nature of the above-described incident, including one co-conspirator acting as a lookout while three others surreptitiously carried a large box into SUBJECT PREMISES 2, and the fact that FRIEDMAN and his co-conspirators used counter-surveillance techniques to identify and

29

evade law enforcement surveillance, there is probable cause to believe that the large cardboard box FRIEDMAN brought into SUBJECT PREMISES 2 on July 21, 2010 contained narcotics and/or narcotics proceeds.

51.    Based on my training and experience, I know:

(a)    Persons engaged in money laundering and narcotics businesses often communicate by telephone, facsimile, mail, e-mail and other means to facilitate their business.  During the course of the investigation, agents have identified numerous wireless telephones used by members of the organization to conduct their illegal activities.

(b)    Persons engaged in money laundering and narcotics businesses often use such financial methods as letters of credit, wire transfers, cash payments, cashiers checks, multiple bank accounts and other methods to conduct their business.  These techniques can be used to disguise the origin and movement of narcotics proceeds.

(c)    Persons engaged in money laundering and narcotics businesses often keep and maintain documents and other records, including, but not limited to, leases, bank records, memoranda, notes, correspondence, contracts, books of account, and financial records, investment records, work papers, canceled checks, drafts, money orders, safety deposit boxes, safes, cash

and cash equivalents, facsimiles, fax machines, notebooks, and
telephone and address records.

(d)   Persons engaged in money laundering and narcotics
businesses, like legitimate business persons, often maintain
and/or create business documents on computer and often use
computers to conduct their business, including to maintain
records of payment and the transmission of electronic mail
messages to criminal associates.

(e)   Persons engaged in money laundering and narcotics
businesses often keep and maintain computerized documents and
other records, including, but not limited to, bank records,
memoranda, notes, correspondence, contracts, books of account,
and  financial records,  investment records, work papers,
e-mails, telephone and address records.

(f)   Persons engaged in money laundering and narcotics
businesses maintain the aforementioned items, records, documents
and tools where they have ready access to them, frequently in
their residences and businesses.

52.   In a substantial number of residential searches
executed in connection with the narcotics trafficking and money
laundering investigations in which I have been involved,
including the instant investigation, and in such searches
conducted by other experienced law enforcement officers who have

31

conveyed their experiences to me, the items described in

paragraphs 51(a)-(f) above have typically been recovered.

52.   Based on the size ███ ████ of his marijuana
trafficking activities, including the number of marijuana grow
houses he controls, the amount of narcotics produced by those
grow houses and the considerable sums of money generated by his
narcotics activities, there is probable cause to believe that
FRIEDMAN must keep records of his narcotics related activities in
order to keep track of his business.  This is consistent with my
training and experience.  In particular, documents such as
leases, property records and utility records could provide
valuable evidence linking FRIEDMAN to many of the marijuana grow
houses he runs on behalf of TMR.

53.   According to CW4, FRIEDMAN does not store the
records of his drug trafficking activities inside any of the grow
houses under his control.  This information is corroborated by
the fact that when law enforcement agents executed the search on
FRIEDMAN's grow house in January 2008 absolutely no records of
any kind were found.  During the four-year investigation agents
have not identified any other readily available locations in
which FRIEDMAN could store such records, such as a business
office, storage facility or warehouse.  Accordingly, there is

32

probable cause to believe that FRIEDMAN stores the records of his

drug trafficking activities at his home residence.

CONCLUSION

WHEREFORE, your deponent respectfully requests that the defendants JASON FRIEDMAN, also known as "Noc," MATE PEROS, also known as "Tiny," and MARCEL PUISSANT, also known as "the Model," be dealt with according to law, and that warrants to search SUBJECT PREMISES 1 and SUBJECT PREMISES 2 be issued.

Because of the nature and contents of this application, I respectfully request that this Affidavit and the search and arrest warrants be filed under seal.

Diette Ridgeway
Special Agent
Drug Enforcement Administration

Sworn to before me this
27th day of July 2010


UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK